UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| THE MOSAIC COMPANY,<br><br>                         **Plaintiff,**<br><br>             **v.**<br><br>UNITED STATES,<br><br>                         **Defendant.** | **Court No. 24-00230** |

## COMPLAINT

Plaintiff The Mosaic Company ("Mosaic"), by and through its attorneys, alleges and states as follows:

### ADMINISTRATIVE DETERMINATION TO BE REVIEWED

1. Plaintiff brings this Complaint to contest certain aspects of the final results of the U.S. Department of Commerce's ("Commerce") second administrative review of the countervailing duty order on phosphate fertilizers from the Russian Federation ("Russia") for the period January 1, 2022 to December 31, 2022. The final results were published in the *Federal Register* on November 12, 2024. *See Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88,960 (Dep't Commerce Nov. 12, 2024) ("*Final Results*"), and accompanying Issues and Decision Memorandum ("IDM").

### JURISDICTION

2. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), as this action was commenced under sections 516A(a)(2)(A)(i)(I) and (a)(2)(B)(iii) of the Tariff Act of 1930, as amended. 19 U.S.C. § 1516a(a)(2)(A)(i)(I), (a)(2)(B)(iii).

**STANDING**

3. Plaintiff is a U.S. producer of phosphate fertilizers and therefore is an interested party within the meaning of 19 U.S.C. § 1516a(f)(3) and 19 U.S.C. § 1677(9)(C). Plaintiff actively participated in the administrative review challenged in this action, including by filing case and rebuttal briefs. Plaintiff therefore has standing to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

**TIMELINESS OF ACTION**

4. Plaintiff commenced this action by filing a summons on December 12, 2024, within 30 days after publication of the *Final Results* in the Federal Register. Plaintiff is filing this Complaint on the next business day following 30 days after the day the summons was filed. Accordingly, this action is timely filed pursuant to 19 U.S.C. § 1516a(a)(2)(A) and Rules 3(a)(2) and 6(a)(1)(C) of this Court.

**HISTORY OF THE ADMINISTRATIVE PROCEEDING**

5. On April 7, 2021, Commerce published a notice issuing the countervailing duty order on phosphate fertilizers from Russia. *Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Apr. 7, 2021) (the "Order").

6. On April 28, 2023, Plaintiff submitted a timely request that Commerce conduct an administrative review with respect to Industrial Group Phosphorite LLC and Joint Stock Company Apatit ("JSC Apatit"). Letter from WilmerHale to Sec'y of Commerce, re: Phosphate Fertilizers From Russia: Request for Countervailing Duty Administrative Review (Apr. 28, 2023). On June 12, 2023, Commerce initiated a countervailing duty administrative review of the Order for JSC Apatit, Industrial Group Phosphorite LLC, and affiliated companies for the period

of review ("POR"), January 1, 2022 through December 31, 2022. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 38,021, 38,030 (Dep't Commerce June 12, 2023). Commerce selected JSC Apatit as the mandatory respondent and rescinded the review with respect to Industrial Group Phosphorite. *See Phosphate Fertilizers From the Russian Federation: Preliminary Results and Partial Rescission of the Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 35,794 (Dep't Commerce May 2, 2024) ("*Preliminary Results*"), and accompanying Preliminary Decision Memorandum ("PDM") at 1. Between August 1, 2023 and April 2, 2024, Commerce received responses to questionnaires, comments on the questionnaire responses, and issued supplemental questionnaires. *See id*. at 2.

7.   Commerce issued the *Preliminary Results* on April 26, 2024. *See Preliminary Results*, 88 Fed. Reg. at 35,796. Commerce preliminarily determined that six subsidy programs were countervailable during the period of review, including the Provision of Natural Gas for Less Than Adequate Remuneration ("LTAR") program. PDM at 14-28. Commerce had previously found this program to be countervailable, and Commerce found that the Government of Russia ("GOR") did not submit any new information in this review to warrant reconsideration of its prior determinations of countervailability. *Id.* at 14. Accordingly, Commerce preliminarily determined that the program confers a financial contribution and is specific. *Id*.

8.   Commerce measured the benefit that the GOR conferred to JSC Apatit under the Provision of Natural Gas for LTAR program by assessing the adequacy of remuneration that JSC Apatit paid for natural gas provided by the GOR under the benchmark hierarchy set forth in 19 C.F.R. § 351.511(a)(2). *Id.* at 14. Consistent with its findings in the investigation, Commerce preliminarily determined that there were no viable "tier one" benchmarks because the Russian market for natural gas was distorted through the GOR's predominant role in the market during

the POR.  *Id.* at 15-17.  Commerce then examined whether there was a viable "tier two" benchmark, pursuant to 19 C.F.R. § 351.511(a)(2)(ii), namely a "world market price where it is reasonable to conclude that such price is available to purchasers in the country in question." *Id*. at 17.

9.      Commerce stated that the record contained the following world market natural gas pricing data: Organization for Economic Cooperation and Development ("OECD") natural gas prices for Europe, and corresponding taxes, sourced from the International Energy Agency ("IEA"), which Mosaic had submitted; and Kazakh natural gas export prices under customs classification code 2711.21.0000 sourced from the Bureau of Natural Statistics ("BNS") of the Agency for Strategic Planning and Reforms of the Republic of Kazakhstan, which JSC Apatit had submitted.  *Id*.

10.     Commerce stated that it had found in other proceedings that the natural gas pipelines connecting Europe and Russia are not bi-directional and do not have the necessary compressors to allow the inflow of gas from Europe into Russia.  *Id.* at 17.  Commerce then stated that it continued to find that natural gas from Europe would not be available to purchasers in Russia, and thus that the European export prices reflected in the IEA data were not viable tier two world market prices.  *Id*.  However, Commerce preliminarily found that natural gas exported from Kazakhstan was available to purchasers in Russia during the POR because a Kazakh natural gas producer, Karachaganak Petroleum Operating BV ("KPO"), reported that it sold natural gas to the Orenburg Gas Plant in Russia using the Karachaganak-Orenburg Transportation System pipeline – a pipeline that terminates in Russia – and BNS reported exports of natural gas to Russia under customs code 2711.21.0000 in 2022.  *Id.* at 17-18.  Commerce found based on this evidence that natural gas exported from Kazakhstan is available to purchasers in Russia and

therefore that Kazakh export prices sourced from BNS was a viable tier two benchmark. *Id*. at 18.

11. On July 23, 2024, Mosaic and JSC Apatit filed case briefs. *See* IDM at 2. On August 5, 2024, Mosaic and JSC Apatit filed rebuttal briefs. *See id.* Mosaic argued in its case brief that Commerce erred in preliminarily selecting a tier two benchmark composed of Kazakh export prices. *See* Letter from WilmerHale to Sec'y of Commerce, re: Phosphate Fertilizers From the Russian Federation: Petitioner's Case Brief (July 23, 2024) at 2-19. Mosaic argued that the Kazakh natural gas data are not suitable as a tier two benchmark because Kazakh export prices are not world market prices that are available to purchasers in Russia. *Id*. Mosaic explained that Gazprom – a Russian governmental entity that controls the Russian gas pipeline system – is the only importer of natural gas from Kazakhstan. KPO's natural gas exports to Russia via the Karachaganak-Orenburg Transportation Pipeline were of raw (high-sulfur) gas sent to Gazprom's Orenburg facility in Russia for processing pursuant to an arrangement between Gazprom and KazRosGas ("KRG"), and, after Gazprom processes the gas, it re-exports the gas back to Kazakhstan. *Id.* at 9. Mosaic also noted that the Kazakh raw gas exported under Gazprom's tolling arrangement with KPO and KRG is not comparable to the dry, pipeline-quality gas that JSC Apatit purchases from Gazprom and its affiliates, and that there was no evidence that export prices for Kazakh gas were "available to" any purchasers in Russia other than Gazprom, which is a Russian governmental entity. *Id.* at 9-10.

12. Mosaic also argued that Kazakh export prices are unusable as a tier two benchmark because government interventions in the market and Western sanctions distort all Kazakh gas prices, including both domestic and export prices. *Id.* at 11-17. Mosaic argued that Commerce should instead rely on the European OECD natural gas prices reported by the IEA to construct a

tier three benchmark of natural gas prices in Russia, consistent with its approach in the investigation. *Id.* at 18-19.

13.   Commerce issued the *Final Results* on November 12, 2024. *See Final Results*, 89 Fed. Reg. at 88,960. In the *Final Results*, Commerce continued to find that exports of Kazakh-origin natural gas to Russia are "available to" purchasers in Russia, and Commerce found that exports of Kazakh-origin natural gas to non-distorted, non-Russian countries could serve as a tier two benchmark under 19 C.F.R. § 351.511(a)(2)(ii). IDM at 29-32. Commerce also found that the alleged government distortion of Kazakh export prices does not disqualify them for use as a tier two benchmark. *Id.* at 31-32. Because Commerce found the BNS natural gas prices were a viable tier two benchmark, Commerce stated that it was not necessary to consider IEA industry natural gas prices as a tier three benchmark. *Id*. at 32.

## STATEMENT OF CLAIMS

### Count 1

14.   Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 13.

15.   Commerce's selection of Kazakh export prices reflected in the BNS data as a tier two benchmark for the Provision of Natural Gas for LTAR program is unreasonable, unsupported by substantial evidence and otherwise not in accordance with law. Commerce's finding that Kazakh export prices for natural gas are "available to" purchasers in Russia within the meaning of 19 C.F.R. § 351.511(a)(2)(ii) is contrary to law, lacks a reasonable explanation, and is not supported by substantial evidence. Commerce also unreasonably found that government distortion of Kazakh export prices for natural gas does not disqualify them for use as a tier two benchmark. Commerce should have rejected the Kazakh natural gas data as unviable for a tier two

benchmark, and instead selected IEA industry gas prices as a tier three benchmark, consistent with Mosaic's arguments and its approach in the original investigation.

## REQUEST FOR JUDGMENT AND RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff respectfully requests that the Court:

1) Hold that certain aspects of Commerce's final results in the first administrative review of the countervailing duty order on phosphate fertilizers from the Russian Federation are unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law; and

2) Remand the *Final Results* to Commerce for disposition in accordance with the Court's final opinion; and

3) Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Jeffrey I. Kessler
David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Alexandra Maurer
Sydney J. Warren
Jacob A. Laband

WILMER, CUTLER PICKERING
  HALE and DORR, LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6612
jeffrey.kessler@wilmerhale.com

Dated: January 13, 2025